No. 27,436.

A. D. ALLISON and C. M. FITZWILLIAM, doing business as ALLISON & FITZWILLIAM, *Appellants,* v. THE CHAMPLIN REFINING COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

1. MINES AND MINERALS—*Oil Drilling Contract—Interference by Owner—Evidence.* In an action to recover damages alleged to have been suffered in the drilling of an oil well, (*a*) the evidence considered and held sufficient to support the findings and judgment, (*b*) it was not error to refuse certain findings requested by the plaintiff.

2. SAME—*Generally.* Various alleged errors considered and held not to require a reversal.

Appeal from Sumner district court; OLIVER P. FULLER, judge. Opinion filed June 11, 1927. Affirmed.

*R. R. Vermilion, Earle W. Evans, Joseph G. Carey* and *W. F. Lilleston,* all of Wichita, for the appellants.

*H. G. McKeever, W. L. Moore* and *R. J. Elam,* all of Enid, Okla., for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover damages alleged to have been suffered in drilling an oil well. The defendant prevailed and plaintiffs appeal.

The facts are substantially related in the court's findings as follows: On July 3, 1924, plaintiffs and defendants entered into a contract for the drilling of an oil and gas well. Its terms were fully complied with, the well completed and payment made therefor except

Mines and Minerals, 40 C. J. p. 1129 n. 2.

that at one time during the drilling operations there was a controversy between the parties as to the interpretation of sections 13 and 22.

Section 13 reads:

"The contractors agree to case off all water and keep the hole dry."

Section 22 reads:

"The contractors agree to prosecute the work actively and continuously to completion. If, however, for any reason, the contractor shall fail to carry on the work in such a manner the company shall have the right and privilege to continue the operation and shall have the use of the contractor's necessary equipment and tools until the well is completed. In such case the company shall pay the contractors as a rental the sum of $20 per day of 24 hours."

Section 11 provided:

"If for any reason the company should desire to regulate the drilling so that the work should be deemed day work, it is to have that privilege and shall pay the contractors for such work at the rate of $70 per each 24-hour day. On such work the company shall not assume any responsibility or liability for the contractor's tools or equipment. Should a fishing job be encountered while doing day work the company shall be privileged to pay for such hole as has been made at the price per foot mentioned above and abandoning operations at its option. On completion of any day work, and after the hole has been placed in the same condition as it was prior to commencing such day work all further drilling shall be done on the foot basis set out."

Section 10 provided:

"The consideration for the completion of the contract shall be $3.25 per foot from top to bottom. And in addition a flat sum of $250 in the event the contractors find it necessary to do any underreaming."

On August 22, 1924, during the course of the drilling, the contractors' daily report to the company showed that the well was making considerable water, and about that time there was a verbal conversation between Mr. D. W. Cotton, representative of the company, and one of the members of the firm of Allison & Fitzwilliam. On the same date the company sent to the contractors a letter reading:

"The daily drilling report from our J. Kraft Well No. 1, which is situated upon southeast quarter section 17-30 S., 1 W., Sumner county, Kansas, shows that the water is not all cased off and that the hole is not dry. Inasmuch as it is common knowledge to both of us that there is an oil-bearing strata likely to be encountered in the neighborhood of 2,500 feet, since a good showing of oil was found in the Hitchcock well No. 1, at 2,535-2,540, we request that no further drilling be done until the water in the hole is cased off and the hole is dry. Kindly refer to paragraph No. 13 of our contract dated July 3, 1924."

To this letter the contractors, on the following day, directed to the company a letter which reads:

"Referring to the note which you had delivered to me last night I wish to say that we are drilling this well in a workmanlike manner and with a view to enabling us to perform our contract. We are carrying the water without any trouble and without endangering the existing sands, and it is our judgment that the 8-inch casing should be set at 2,720 feet. If, however, you insist on having the casing set at 2,490 feet we are willing to do this with the express understanding, however, you will pay for all underreaming and assume all responsibility.

"Please let us hear from you in writing in answer to this immediately, for until we do hear from you we will continue to bail the water and charge you at the rate of $70 per day in consequence of your regulation of the drilling."

After the correspondence above referred to there was a meeting between a representative of the company and the contractors, in the office of the attorneys for the contractors at Wichita, and afterwards another letter sent to the contractors by the company. But the court finds as a fact that there was neither at the conversation in the law office at Wichita nor in the latter correspondence anything that in any way affected the rights of the parties differing from the quoted parts of the contract and the letters above referred to. There was evidence to the effect that the amount of water that the well was making at and during the time of the controversy was not of sufficient quantity to cause the well to be regarded by drillers generally as anything other than dry. It was admitted that at that time the well was making about four or five bailers of water per hour, the exact amount being somewhat in controversy, and there was also testimony to the effect that a well making the amount of water admitted would not be regarded as a dry hole. While neither side of this controverted question was satisfactory to the court, even though a greater number of witnesses testified on one side than on the other, and all witnesses well qualified, this court finds that it is not necessary to determine that particular issue in this lawsuit. At no time did the company ever undertake to regulate the drilling operations. If, as a matter of fact, the well was dry, as now strenuously contended by the contractors, then there was nothing in the request of the company to prevent the contractors from going right on with their operations in the work, and there would have been no necessity for the expense for which they now make charge. If as a matter of fact the well was not dry, it was the duty of the contractors when request was made to comply with section 13 of the contract and case

the water off, and in which event they would not have been entitled to the compensation for which they now claim. If the contractors were not willing to assume the responsibility of the well being dry at the time of the controversy and had set the casing at about 2,490 feet, and cased the water off, then afterwards had found that it was necessary to underream and set the 8-inch casing at a lower depth of 2,720 feet, they were protected by the contract wherein it provided that the defendant should pay for such underreaming.

A careful consideration of the record leads us to the same conclusion as that arrived at by the trial court. The plaintiff contends that on the admitted facts established by the evidence the trial court should have made plaintiff's requested finding No. 16, which reads:

"The plaintiffs upon receipt of defendant's letter of August 22, were obliged to cease drilling, or at least justified in ceasing drilling and in all the circumstances of this case, were entitled to reasonable compensation for the use of their tools, machinery and equipment and reimbursement for moneys expended for labor during the five and three-fourths days drilling operations were suspended, and reasonable compensation for such is seventy dollars per day."

We think not. There was evidence on which the trial court could have made a specific finding either that the hole was wet, or that it was dry. If, as contended by plaintiffs, the hole was dry when they received defendant's letter of August 22, they should have proceeded with the drilling. If, on the other hand, it was wet as contended by defendants, it was the duty of the plaintiffs to case off the water and proceed with the drilling. In addition to the written communications between the parties there was oral testimony bearing upon the question as to whether or not the defendants undertook to regulate the drilling operations. The court's finding upon this controverted question determined the issues in the case. The plaintiff cites 1 Thornton, Law of Oil and Gas, 4th ed., § 369, to the effect that if the lease owner interferes with the drilling and stops the operations, the driller is entitled to recover whatever damage he thereby has sustained. Various other authorities, including *Shanks v. Oil & Gas Co.*, 116 Kan. 525, 227 Pac. 251, and *Smith v. Eggleston Oil Co.*, 117 Kan. 619, 232 Pac. 870, are cited in support of the text. They are not applicable for the reason that in the instant case the defendants did not interfere with or stop the operations.

Other questions argued in the briefs have been considered, but need no elucidation. We find no error which would warrant a reversal.

The judgment is affirmed.